UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                    :
CINDY KOUMANTAROS,                                  :
                                                    :
        Plaintiff,                                  :
                                                    :           03 Civ. 10170 (GEL)
   -against-                                        :
                                                    :        **OPINION AND ORDER**
THE CITY UNIVERSITY OF                              :
NEW YORK,                                           :
                                                    :
        Defendant.                                  :
                                                    :
-------------------------------------------------------------x

Krishnan S. Chittur, Chittur & Associates, P.C.,
New York, NY, for plaintiff.

Antoinette W. Blanchette, Assistant Attorney General
(Eliot Spitzer, Attorney General of the State of New York,
of Counsel), for defendant.

GERARD E. LYNCH, District Judge:

        Plaintiff Cindy Koumantaros brings this action pursuant to Title VI of the Civil Rights

Act of 1964, 42 U.S.C. § 2000d, 42 U.S.C. § 1981, 42 U.S.C. § 1983, the New York State

Human Rights Law, N.Y. Exec. Law §§ 296 et seq. ("SHRL"), the New York City Human

Rights Law, N.Y.C. Admin. Code §§ 8-107 et seq. ("CHRL"), and the due process and equal

protection clauses of the federal and New York state constitutions, alleging discriminatory

dismissal from the Physician Assistant Program (the "Program"), an educational curriculum

operated by the City College of New York ("CCNY").  Plaintiff also alleges that defendant took

adverse action against her in retaliation for engaging in protected activity under Title VI, and

that defendant maintained a racially hostile educational environment.  Defendant moves for

summary judgment dismissing plaintiff's claims in their entirety.  Plaintiff cross-moves for

partial summary judgment on her due process claims.  Defendant's motion will be granted in part and denied in part.  Plaintiff's motion will be denied.

## BACKGROUND

The following facts are undisputed or established by undisputed documentary evidence. Additional factual contentions will be addressed in later portions of this opinion.

Plaintiff, a white woman, applied for admission to the Program in September 2001.  (Def. Exh. G.)  The Program is a curriculum within CCNY, which is a branch of the City University of New York ("CUNY").  (Def. Exh. D.)  CUNY is a public university established under the Education Law of the State of New York.  (Id.)  Plaintiff was initially waitlisted for admission to the Program, but she was eventually admitted as a student in the Class of 2004.  (Pl. Dep. 26; Def. Exh. H.)  Plaintiff began attending classes in March 2002.  (Pl. Dep. 40.)

The Program consists of 18 months of classroom instruction, followed by 13 months of clinical training in various medical fields.  (Def. Exh. F at 16.)  The Program's rules require students to obtain a grade of "C" or better in all pre-clinical courses to progress to the clinical year of the Program.  (Def. Exh. F at 25; see also Pl. Dep. 36 (stating plaintiff's understanding that "the minimum exam grade" to remain in the Program is 70).)  One of the Program's required courses is Physiology II, which is offered in the Spring semester each year.  (Def. Exh. F at 17).  Physiology II is "a major component [of the Program], which no one is supposed to move forward without [passing]."  (Wright Dep. 150.)

Plaintiff enrolled in Physiology II during the Spring 2003 semester.  (Def. Exh. K.)  On May 27, 2003, plaintiff was informed that she had failed the Physiology II final exam with a grade of 60, thereby giving her a failing final course grade of 68 in Physiology II.  (Def. Exh. J;

Def. Exh. K; Wright Aff. ¶ 18.)  Shortly thereafter, on June 5, 2003, a Physiology II make-up exam was given to students who had failed the final exam, including plaintiff.  (Pl. Dep. 36; Stugensky Aff. ¶ 10.)  Students who receive a passing grade on a make-up exam are considered to have passed the course.  (Garvey Aff. ¶ 9.)  Plaintiff was informed that she "must pass this [make-up] exam to continue in the Summer semester."  (Def. Exh. J.)

Plaintiff failed the make-up exam with a grade of 49, thereby giving her a failing grade in Physiology II.  (Def. Exh. K.)  As a result of her Physiology II failure, plaintiff was referred to the Course and Standing Committee ("CSC").  (Wright Aff. ¶ 12.)  The CSC is responsible for enforcing the Program's academic standards, assessing the academic and clinical progress of all students, and making recommendations to the Program Director, Assistant Dean Adrian Llewellyn, with respect to remedial action or academic sanctions where appropriate.  (Def. Exh. F at 36; Wright Aff. ¶ 5.)  However, the Program Director has sole final authority with respect to academic sanctions or decisions affecting the standing or matriculation of a student in the Program.  (Llewellyn Aff. ¶ 15; Stugensky Aff. ¶ 7; Wright Aff. ¶ 7.)

The CSC considered plaintiff's Physiology II failure during meetings held on July 11 and 16, 2003.  (Def. Exhs. L, O.)  The CSC recommended that the instructor of Physiology II, Dr. Maureen Garvey, offer plaintiff a second Physiology II make-up exam with a two-week preparation period and review assistance from Edwin Eustaquio, the Program's Senior Clinical Coordinator.  (Def. Exh. O.)  However, Dr. Garvey did not offer second make-up exam to plaintiff.[1]  As a result, plaintiff's Physiology II failure remained in place.  (Def. Exh. P.)

---

[1] Dr. Garvey does not specifically recall the CSC's recommendation that plaintiff be offered a second make-up exam in Physiology II.  (Garvey Aff. ¶ 14.)  However, according to Dr. Garvey, plaintiff "had sufficient opportunity to achieve mastery of the Physiology II subject

Thereafter, by letter of July 30, 2003, the CSC advised plaintiff that, due to her failure in Physiology II, she would be placed on academic probation for one year.  (Id.)  In addition, the Program's official policy, as outlined in the Student Handbook, is to place a student who fails a pre-clinical course in a sort of educational limbo – a student who fails a pre-clinical course "must return the following year to repeat the course, and may not progress to other program courses until the failed course has been successfully completed."[2]  (Def. Exh. F at 26.)  This policy is known as "recycling" or "serving a prescriptive year."  (Stugensky Aff. ¶ 8.)  Thus, because plaintiff failed a pre-clinical course, the Program's official policy was to "recycle" her, that is, to postpone her progress until she passed Physiology II.  As pre-clinical courses are only offered once a year, had plaintiff in fact been "recycled," she would not have been allowed to progress in the Program until after the Spring 2004 semester, when Physiology II was next offered.  (Def. Exh. F at 19.)

But the Program did not apply its official policy to plaintiff, and plaintiff was never "recycled."  Instead, plaintiff was allowed to progress in the Program and enroll in classes in the Summer 2003 semester.  (Stugensky Aff. ¶ 17.)  As a result of plaintiff's Physiology II failure, however, the Program delayed plaintiff's entry into clinical rotations for six weeks during the

---

matter at the time of the Physiology II final examination and subsequent make-up examination," and so she would have been "disinclined" to offer a second make-up exam to plaintiff.  (Id.)  In any case, plaintiff has presented no evidence that the Program routinely recommends, or that any instructor routinely – or ever – administers a second make-up exam.

[2] As discussed infra, plaintiff argues that the Program faculty and administrators do not adhere to the procedures laid out in the Handbook, but instead routinely violate them.  (See, e.g., Pl. Aff. ¶¶ 47-57.)  However, plaintiff does not dispute the actual contents of the Handbook, nor does she dispute that she received the Handbook at the time of her matriculation in the Program, thereby informing her of the Program's official policies.  (Pl. Dep. 39-40.)

4

Summer 2003 semester.  (Def. Exh. P.)  During this six-week delay, plaintiff was required to meet with Dr. Aftab Hassan, the Program's Educational Specialist, "to demonstrate[] competency in Physiology [II]."  (Stugensky Aff. ¶ 17; see id. ("It was the CSC's expectation that plaintiff . . . would demonstrate a satisfactory level of Physiology II knowledge after six-weeks of exclusive, intensive review with [Academic Skills Enhancement Program] assistance, and progress to her clinical year thereafter.").)  In addition, plaintiff was advised that, should she fail any of the summer courses, "[she would be] brought before the [CSC] for review and recommendation for dismissal."  (Def. Exh. P.)

Plaintiff enrolled in the Geriatrics course during the Summer 2003 semester.  (Def. Exh. T.)  In August 2003, plaintiff was informed that she had failed the Geriatrics final exam with a grade of 59, thereby giving her a failing grade in the course.  (Pl. Aff. ¶¶ 58, 62.)  On September 4, 2003, plaintiff was called before the CSC.  According to the Program's official policy, any student who fails two or more courses "will be dismissed," subject to the Program's discretion. (Def. Exh. F at 26.)  Therefore, according to the Program's official policy, plaintiff's failure in Geriatrics – occurring less than three months after her failure in Physiology II – put her at risk of dismissal from the Program.

However, at the September 4, 2003 meeting, plaintiff claimed that her Geriatrics exam had been erroneously graded.  (Def. Exh. R; Pl. Aff. ¶ 68; Stugensky Aff. ¶ 20.)  The CSC adjourned the meeting for a short time to allow plaintiff to review her exam.  (Pl. Aff ¶ 68; Stugensky Aff. ¶ 21.)  Plaintiff's review of the exam confirmed that she had indeed failed the

exam.  (Id.)[3]  Accordingly, on September 4, 2003, the CSC unanimously voted to dismiss

plaintiff from the Program.  (Def. Exhs. R, S; Pl. Aff. ¶ 68.)

On December 23, 2003, plaintiff filed the complaint that initiated the present action.  On

March 16, 2006, defendant moved for summary judgment.  Plaintiff submitted her response and

cross-motion for partial summary judgment on June 9, 2006.  Defendant submitted its reply and

its response to plaintiff's cross-motion on October 4, 2006.  Plaintiff submitted her reply on

October 18, 2006.

**DISCUSSION**

**I.      Summary Judgment Standards**

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  The Court's responsibility is to determine if there is a

genuine issue to be tried, and not to resolve disputed issues of fact.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986).  The Court must draw all reasonable inferences and

resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most

favorable to the nonmoving party.  Id. at 254-55.  However, "[i]f the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50

(citations omitted).

---

[3] Although plaintiff argues that she was not given a "proper" review of the Geriatrics
exam, she does not dispute that, according to her own grading of the exam as per the instructor's
answer key, she did indeed receive a failing grade.  (Stugensky Aff. ¶ 21; see Pl. Aff. ¶ 87
(offering conflicting testimony as to whether her grade was actually 59 or 57, but not disputing
that either would constitute a failing grade).)

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists.  See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).  Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact.  Anderson, 477 U.S. at 250.  A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party.  Id. at 248.

Rule 56 also provides that an affidavit submitted in opposition to summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  "[P]ersonal knowledge" does not include hearsay: "[H]earsay testimony . . . that would not be admissible if testified to at the trial may not properly be set forth in [the Rule 56(e) affidavit]."  Beyah v. Coughlin, 789 F.2d 986, 989 (2d Cir. 1986) (alterations in original) (citation and internal quotation marks omitted).  In addition, "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion."  Davis v. State of New York, 316 F.3d 93, 100 (2d Cir. 2002); see also id. ("The nonmoving party must go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.") (alterations in original) (citation and internal quotation marks omitted).

## II.   Plaintiff's § 1981, § 1983, SHRL, and CHRL Claims

Plaintiff contends that defendant violated § 1981, § 1983, SHRL, and CHRL.  Defendant CUNY is an arm of the State of New York.  Because the state has not waived its Eleventh

Amendment immunity to claims brought under § 1981, § 1983, SHRL, or CHRL, these claims will be dismissed and the Court need not reach their merits.

The Eleventh Amendment of the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. Amend. XI.  "[F]ederal courts lack jurisdiction not only over suits against a state brought by citizens of other states, as the literal language of the Amendment provides, but also over suits against such states brought by their own citizens."  Dube v. State Univ. of N.Y., 900 F.2d 587, 594 (2d Cir. 1990).  Thus, the Eleventh Amendment bars all federal suits for any kind of relief against the State of New York, absent the State's waiver of its sovereign immunity or an abrogation of that immunity by Congress.  See Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989).[4]

Although CUNY is not denominated a state agency, it is nevertheless entitled to immunity if it "can properly be characterized as an 'arm of the State.'"  Pikulin v. City Univ. of N.Y., 176 F.3d 598, 600 (2d Cir. 1999), quoting Rosa R. v. Connelly, 889 F.2d 435, 437 (2d Cir. 1989).  The arm-of-the-state inquiry should focus "both on the extent to which the state would be responsible for satisfying any judgment that might be entered against the defendant entity . . . and on the degree of supervision exercised by the state over the defendant entity . . . ."  Id. (citations omitted).  Because CUNY senior colleges are "both funded and administered by the state to a great degree," Hester-Bey v. N.Y. City Tech. Coll., No. 98 Civ. 5129, 2000 WL

---

[4] For unknown reasons, plaintiff has never sought to name as a defendant any individual officer or agent of CUNY, to whom the Eleventh Amendment bar would not apply.  See Ex parte Young, 209 U.S. 123 (1908).

488484, at *4 (E.D.N.Y. 2000), courts in this Circuit have consistently held that CUNY senior colleges are arms of the state for purposes of Eleventh Amendment immunity. <u>See</u> <u>Sacay v. Research Found. of City Univ. of N.Y.</u>, 193 F. Supp. 2d 611, 625 (E.D.N.Y. 2002); <u>Becker v. City Univ. of N.Y.</u>, 94 F. Supp. 2d 487, 490 (S.D.N.Y. 2000); <u>Salerno v. City Univ. of N.Y.</u>, No. 99 Civ. 11151, 2000 WL 1277324, at *3 (S.D.N.Y. 2000).

The Program is administered by the Sophie Davis School of Biomedical Education. (Def. Exh. E.) The Sophie Davis School is an institution within the City College of New York, a four-year senior college operated and financed by CUNY. (Def. Exh. C.) <u>See</u> <u>Weinbaum v. Cuomo</u>, 631 N.Y.S.2d 825, 826 n.1 (1st Dep't 1995) (listing the CUNY senior colleges). Thus, plaintiff must demonstrate that the State of New York has waived its immunity or that its immunity has been abrogated by Congress under its Fourteenth Amendment enforcement powers with respect to her claims in order to bring a suit against CUNY in federal court.

Plaintiff has not, nor can she, demonstrate that a valid waiver or abrogation applies to her § 1981, § 1983, CHRL, or SHRL claims. <u>See</u> <u>Hewlett v. Rose</u>, 496 U.S. 356, 365 (1990) ("[T]he State and arms of the State, which have traditionally enjoyed Eleventh Amendment immunity, are not subject to suit under § 1983 in either federal or state court."); <u>Cajuste v. Lechworth Dev. Disabilities Serv.</u>, No. 03 Civ. 0161, 2005 WL 22863, at *3 (S.D.N.Y. Jan. 5, 2005) (finding Eleventh Amendment immunity for suits against New York brought pursuant to § 1981); <u>Leiman v. State of New York</u>, No. 98 Civ. 5538, 2000 WL 1364365, at *6-7 (S.D.N.Y. Sept. 21, 2000) (same for suits brought pursuant to SHRL and CHRL). Indeed, plaintiff concedes that the Eleventh Amendment operates as a bar to these claims. (Pl. Mem. 3 n.1 ("Defendant also claims

Eleventh Amendment immunity for claims under 42 U.S.C. §§ 1981, 1983, and the City and

State Human Rights Law.  [Plaintiff] does not dispute such immunity for present purposes.").)

Accordingly, plaintiff's § 1981, § 1983, SHRL, and CHRL claims are dismissed.

## III.    Plaintiff's Constitutional Claims

Though conceding dismissal of her § 1981, § 1983, SHRL, and CHRL claims, plaintiff

attempts to evade the Eleventh Amendment sovereign immunity bar by substituting a free-

standing equal protection claim under the federal constitution and due process claims under the

federal and New York State constitutions.  (Pl. Mem. 4-8.)[5]  Because the Eleventh Amendment

bars these claims as well, defendant's motion for summary judgment on plaintiff's state and

federal constitutional claims is granted, and plaintiff's motion for summary judgment is denied.

Plaintiff claims defendant violated the due process and equal protection clauses of the

Fourteenth Amendment.  However, as an initial matter, because § 1983 provides a remedy for

plaintiff's causes of action, plaintiff cannot base her constitutional claims directly on the

Fourteenth Amendment.  Pauk v. Bd. of Trustees of City Univ. of N.Y., 654 F.2d 856, 865 (2d

Cir. 1981) ("[W]hen § 1983 provides a remedy, a . . . cause of action grounded on the

Constitution is not available."); Turpin v. Mailet, 591 F.2d 426, 427 (2d Cir. 1979) (rejecting

cause of action against municipality grounded directly on Constitution because of availability of

§ 1983).

Even if plaintiff could ground her due process and equal protection claims directly on the

Constitution, such claims would nevertheless be barred by the Eleventh Amendment.  Congress

_____

[5] These theories are not asserted in the complaint, and are advanced for the first time in
plaintiff's response to defendant's summary judgment motion.

has the power to abrogate a state's Eleventh Amendment immunity via the enforcement

provisions of the Fourteenth Amendment; however, Congress has not abrogated state immunity

with respect to freestanding claims brought pursuant to § 1 of the Fourteenth Amendment, and

New York has not waived such immunity.  As the Second Circuit has held, "[s]ection 1 alone,

without any accompanying § 5 action, [is] insufficient to permit private suits against states or

state officials in the face of Eleventh Amendment immunity." Santiago v. N.Y. State Dep't of

Correctional Servs., 945 F.2d 25, 30 (2d Cir. 1991).[6]  Therefore, plaintiff's federal due process

and equal protection claims are barred by the Eleventh Amendment.

Plaintiff next attempts to overcome the jurisdictional bar by alleging a due process claim

under the New York State constitution.  But this is no more successful.  The Eleventh

Amendment's jurisdictional bar is addressed to federal *courts*, not to federal causes of action,

and contains no exception for pendent state law claims. Pennhurst State Sch. & Hosp. v.

Halderman, 465 U.S. 89, 120 (1984) ("The Eleventh Amendment should not be construed to

apply with less force to [pendent] jurisdiction than it does to the explicitly granted power to hear

federal claims.").  Thus, plaintiff's due process claim is a pendent state law claim that is barred

by the Eleventh Amendment.  See Derechin v. State Univ. of N.Y., 731 F.Supp. 1160, 1164

(W.D.N.Y. 1989) (dismissing due process claim under New York State constitution as "barred

by sovereign immunity"); cf. Young v. N.Y. City Transit. Auth., 903 F.2d 146, 164 (2d Cir.

1990) ("New York State has a definite interest in determining whether its own laws comport

---

[6] In contrast, plaintiff's Title VI claim survives the Eleventh Amendment bar because
Congress specifically and unequivocally abrogated the states' immunity against such claims
pursuant to its enforcement powers under § 5 of the Fourteenth Amendment.  See Section IV,
infra.

11

with the New York Constitution. . . . [T]he federal district court [is] ill-disposed to undertake such a task.").

Plaintiff argues that 28 U.S.C. § 1367 authorizes her suit.  Section 1367 grants federal district courts supplemental jurisdiction over state law claims that are related to claims over which the court already has jurisdiction.  28 U.S.C. § 1367(a).  However, § 1367 does not independently abrogate state immunity from pendent state law claims, which remain barred by the Eleventh Amendment unless a valid waiver or abrogation exists.  Raygor v. Regents of Univ. of Minn., 534 U.S. 541, 542 (2002) ("§ 1367(a)'s grant of jurisdiction does not extend to claims against nonconsenting state defendants."); Iwachiw v. NYC Bd. of Elections, 217 F. Supp. 2d 374, 380 (E.D.N.Y. 2002) (requiring abrogation or waiver of immunity "[f]or the [federal] Court to have the power to adjudicate the [pendent] state law claim").[7]

Plaintiff's constitutional claims amount to facially unsuccessful attempts to evade the Eleventh Amendment.  Accordingly, defendant's motion for summary judgment with respect to plaintiff's federal and state constitutional claims is granted, and plaintiff's motion for summary judgment on her due process claims is denied.

## IV.   Plaintiff's Title VI Claims

Plaintiff's Title VI claims, however, do avoid the Eleventh Amendment bar, since Congress has explicitly abrogated the states' immunity from such claims.  42 U.S.C. § 2000d-

_____

[7] Plaintiff moves for summary judgment on her due process claim under the New York State constitution, even though her complaint did not include such a claim.  (Def. Resp. 9; Def. Exh. B.)  Although, under certain circumstances, it would be fair and reasonable to construe pleadings liberally in such a way as to allow a party to go forward with claims that had not been asserted previously (see n.29, infra), regardless of how the Court interprets plaintiff's pleadings, her constitutional claims are barred by the Eleventh Amendment.

7(a); Grimes v. Sobol, 832 F.Supp. 704, 707 (S.D.N.Y. 1993), aff'd, 37 F.3d 857 (2d Cir. 1994) (per curiam).  Specifically, plaintiff claims that (1) she was dismissed from the Program because of her race; (2) defendant retaliated against her for engaging in protected activity under Title VI; and (3) defendant maintained a racially hostile educational environment.

Plaintiff has failed to produce sufficient evidence by which a reasonable factfinder could determine that her dismissal from the Program was either discriminatory or retaliatory. However, plaintiff has produced sufficient evidence to raise a triable issue of fact on her hostile educational environment claim.  Therefore, defendant's motion for summary judgment will be granted with respect to plaintiff's discriminatory dismissal and retaliation claims, and denied with respect to plaintiff's hostile educational environment claim.

A.     Discriminatory Dismissal

Plaintiff asserts that defendant discriminated against her in violation of Title VI.  42 U.S.C. § 2000d.  Title VI prohibits discrimination based on "race, color, or national origin," in connection with "any program or activity receiving Federal financial assistance."[8]  Id.  "In order to establish a claim based on Title VI, the plaintiff must show, inter alia, that the defendant discriminated against [her] on the basis of race, that that discrimination was intentional, and that the discrimination was a substantial or motivating factor for the defendant's actions."  Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001) (citations and internal quotation marks omitted).

---

[8] Title VI covers only those claims of discriminatory conduct where "federal funding is given to a non-federal entity which, in turn, provides financial assistance to the ultimate beneficiary."  Soberal-Perez v. Heckler, 717 F.2d 36, 38 (2d Cir. 1983).  There is no dispute that CUNY, a non-federal entity, receives federal funding, or that plaintiff is a recipient of financial aid.  (Cf. Pl. Dep. 91 ("[E]very time I would have an opportunity to apply for financial aid I would do so.  And then I will receive [sic] checks from the school.").)

Thus, to be cognizable under Title VI, defendant's discriminatory intent must "actually play[] a role in" and have a "determinative influence" on the adverse action.[9]  Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).

In determining whether plaintiff's dismissal from the Program violated Title VI, the Court is guided by the analysis developed under Title VII.  See Jackson v. Univ. of New Haven, 228 F. Supp. 2d 156, 159-60 (D. Conn. 2002); McKie v. N.Y. Univ., No. 94 Civ. 8610, 2000 WL 1521200, at *3 n.1 (S.D.N.Y. Oct.13, 2000).  Accordingly, the Court must analyze plaintiff's claim through the familiar framework created by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[10]  To establish a claim under McDonnell Douglas, plaintiff must first "successfully assert[] a prima facie case" against defendants.  Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004).  If plaintiff makes out a prima facie case, the burden shifts to the defendant to show a "legitimate, nondiscriminatory reason for" its conduct.  Id.  Plaintiff then has the opportunity to prove "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were

---

[9] Plaintiff attributes significance to the proportion of white to non-white students and faculty. (See Wright Dep. 11-17 (questioning the Program's medical director on the proportion of white to non-white students and faculty in the Program).)  However, Title VI, unlike Title VII, does not prohibit disparate impact, only disparate treatment: "Title VI itself directly reach[es] only instances of intentional discrimination."  Alexander v. Sandoval, 532 U.S. 275, 281 (2001) (alterations in original) (citation and internal quotation marks omitted).  Thus, such evidence is only relevant as far as it leads to a possible inference of intentional discrimination.

[10] Courts in this Circuit have consistently applied McDonnell Douglas to Title VI claims. See McKie, 2000 WL 1521200, at *3 n.1 (applying McDonnell Douglas analysis to disparate treatment claims under Title VI); Bettis v. Safir, No. 97 Civ. 1908, 2000 WL 1336055, at *1 (S.D.N.Y. Sept. 15, 2000) (same).

a pretext for discrimination." Id., citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Plaintiff may show a prima facie case under Title VI through direct evidence of discriminatory conduct, or where direct evidence is unavailable, as it is here, through indirect evidence, by demonstrating that: (1) she is a member of a protected class; (2) she suffered an adverse action in pursuit of her education by defendant; (3) she was treated differently from similarly situated students who are not members of the protected class; and (4) she was qualified to continue in her educational pursuit.  See Bell v. Ohio State Univ., 351 F.3d 240, 253 (6th Cir. 2003).[11]

Plaintiff has failed to show a prima facie Title VI case.  Although plaintiff is a member of a protected class (white), and she suffered an adverse action at the hands of defendant in pursuit of her education (dismissal), she has failed to show that she was treated differently from similarly situated, non-white students.[12]  In any event, even if plaintiff did satisfy the prima facie

---

[11] The test formulated in Bell adapts the McDonnell Douglas test to the educational context.  351 F.3d at 252-53.  Although the test was applied in that case to a § 1981 claim, both § 1981 and Title VI borrow the same test from Title VII.  See n.10 and accompanying discussion, supra.

[12] The fourth prong of the test calls for an objective determination of whether plaintiff would be a competent physician's assistant.  Plaintiff's repeated failures in the Program – including her failure in a "major" pre-clinical course – certainly weigh against a finding of competence.  But it is difficult for a court to determine who is and who is not qualified to work as a physician's assistant; usually, such a determination is best left educators themselves.  See Ward v. N.Y. Univ., No. 99 Civ. 8733, 2000 WL 1448641, at *3 (S.D.N.Y. Sept. 28, 2000) ("Educational institutions are afforded considerable deference when making decisions concerning academic standards.").  Defendant's individualized treatment of its students reflects this difficulty; the Program reserves discretion to determine competence because competence is not a static, homogenous characteristic.  (Def. Exh. F at 26; Wright Dep. 185 (stating that the CSC "look[s] at anything that directly impacts . . . on [a] student's performance" in issuing recommendations).)  However, because plaintiff cannot satisfy the third prong of the test, the

standard, her complaint still fails, because defendant has set forth a legitimate basis for its actions, and plaintiff has failed to raise a genuine issue of fact as to whether defendant's reason was pretextual.

As the undisputed facts set forth above demonstrate, plaintiff was dismissed from the Program for failing grades, in accordance with essentially objective, established policies. She argues, however, that her dismissal was nevertheless discriminatory, because the policies were in fact administered in a manner that gave preferential treatment to non-white students. Plaintiff does not seriously contest that she correctly received the failing grades, and that the failures warranted dismissal under the Program's policies. She contends, however, that non-white students regularly failed examinations, but were nevertheless given passing grades, or were given repeated re-tests, or were retained in the Program despite multiple failures. The application of the rules, she therefore contends, was discriminatory, because the same rules were not applied to others.

However, plaintiff's assertions are not supported by any admissible evidence, but rather by her subjective opinions, bolstered by hearsay and rumor. Plaintiff repeatedly cites in her affidavit and testimony numerous examples of other, non-white students that she claims were similarly situated to her and who were treated preferentially over her, but she has no first-hand knowledge of their situations, and she has provided no evidence of her claims other than hearsay and conjecture.[13] The only other testimony plaintiff submits in support of her claim of

_____

Court need not determine whether plaintiff was objectively qualified to continue in her education.

[13] Pl. Dep. 170 ("All I remember him saying . . ."); id. ("According to what I have heard from other people . . ."); id. 175 ("Ms. Stugensky told her . . ."); id. 177 ("According to what she

discriminatory dismissal is an affidavit by her friend, Mohammed Rahman, whose testimony also consists almost entirely of conjecture and hearsay.[14]  See Oparaji v. United Fed'n of Teachers, 418 F. Supp. 2d 139, 146 (E.D.N.Y. 2006) (rejecting "unsubstantiated hearsay" in plaintiff's affidavit as not "competent evidence under Rule 56").

Moreover, plaintiff's proferred documentary evidence is unauthenticated, and it is impossible to glean any conclusions from it that support plaintiff's discriminatory dismissal claim.  For example, plaintiff argues that the grading sheets she has submitted as evidence support her claims of differential treatment.  (Pl. Exhs. 3-6, 9.)  However, upon searching examination, the Court can find nothing in the documents to support plaintiff's claims; they are mostly just a mix and jumble of numbers and codes, and although plaintiff believes that she knows what the numbers and codes stand for (Pl. Dep. 172), she has not attempted to confirm her beliefs, but instead relies on her own conclusory interpretation of the documents.  In addition, the little information that can be gleaned from the grading sheets support defendant's argument that plaintiff was not treated differently from similarly situated, non-white students. (Pl. Exh. 3, Class of 2004 Course Grades, Spring Semester 2003 (noting that plaintiff was the *only* student to receive a final  grade of "F" in Physiology II).

---

said . . ."); id. 180 ("[I]f Ms. Stugensky told him he doesn't have to take the make-up exam, therefore he didn't take it."); id. 191 ("I believe she did."); Pl. Aff. ¶ 26 ("It is well known that . . .").

[14] Rahman Aff. ¶ 40 ("This was routine practice . . ."); id. ¶ 48 ("[T]he defendant informed [plaintiff] . . ."); id. ("They also told her . . ."); id. ¶  57 ("I believe that [plaintiff's] failure [in Geriatrics] was simply a ruse to dismiss her."); id. ¶ 65(e) ("When I asked [a non-white student] what she did to get thru [sic] the make up exam, she said that Dr. Hassan 'hooked' her up.").

17

In contrast, several of the Program's faculty and administrators testified that plaintiff was not treated differently from similarly situated, non-white students, but instead was treated either according to, or better than, the Program's official policies.[15]  Unlike plaintiff, the Program's faculty and administrators have first-hand knowledge of the Program's conduct towards its students, and in every instance, their testimony refutes plaintiff's argument that she was treated differently from similarly situated, non-white students.  (Llewellyn Dep. 191-213 (discussing the dismissal of several non-white students due to repeated course failures); id. 227-228 (distinguishing between plaintiff and a non-white student on the basis that the non-white student passed the course make-up exam); Wright Dep. 187-88 (discussing the dismissal of a non-white student who also had failed two courses).)[16]

In addition, defendant has submitted supporting documentation which shows that plaintiff was treated in a like manner to similarly situated, non-white students.[17]  Specifically, this

---

[15] Eustaquio Dep. 88 ("Typically, if a student has failed a course, any course, they are typically on probation until they successfully complete that course again.  In this case, Cindy had failed physiology.  That course is only offered once per year, so she would have to wait a year to take the course again, so she would be on probation until she passed the course."); Llewellyn Aff. ¶ 22 ("[The CSC's decision] permitted plaintiff to advance to other pre-clinical courses [after failing Physiology II] and only delayed her clinical year by a mere *six weeks*, rather than requiring plaintiff to halt her progression in the Program for *one year* until she could re-take and successfully complete Physiology II.") (emphasis in original).

[16] The Court, of course, makes no judgment about the *credibility* of these witnesses' testimony.  The point is simply that their testimony is admissible because they have first-hand knowledge of how students other than plaintiff were treated.  In contrast, plaintiff's knowledge of how other students fared on exams, or how they were treated by the Program, is for the most part based on hearsay and therefore cannot be received to refute the administrators' accounts.

[17] The only non-hearsay evidence that plaintiff was treated differentially by the Program reflects treatment that was *preferential*, for the benefit of plaintiff, rather than adverse. (Stugensky Aff. ¶ 16 ("[I]n consideration of plaintiff's concerns over her Physiology II final examination review process, the CSC agreed to recommend that plaintiff be placed on academic probation for at least one year, but not be required to serve a prescriptive year.").)

18

documentation consists of letters sent to similarly situated, non-white students by the Program, detailing their individual punishments for class failures.  (Def. Exhs. U, V, W.)  These letters are similar in both form and substance to the letter received by plaintiff which outlined the conditions of her continued enrollment in the Program after her failure in Physiology II.  (Def. Exh. P.)  (Compare id. (placing plaintiff on probation for "one year" as a result of her failure in Physiology II), with Def. Exh. V (placing a similarly situated, non-white student on probation for "*at least* one year" as a result of her failure in Pharmacology) (emphasis added).)  This documentation, along with the sworn statements of the Program's faculty and administrators and the official, stated policies of the Program, contrasts starkly with the rumors and speculation upon which plaintiff relies.[18]  In short, plaintiff presents no admissible evidence that even a single non-white student who failed a second course while on probation for failing a first was permitted to continue in the Program.[19]

Moreover, plaintiff's dismissal was mandated by the Program's official policy towards students who fail two courses during the pre-clinical year.  (Def. Exh. F at 26.)  Of course, "official policy" may be merely a cover for discriminatory conduct – a facially non-

---

[18] Stugensky Aff. ¶ 9 ("The Program's policy and the CSC's practice has also been to recommend a student's dismissal from the Program if they fail a pre-clinical course while on academic probation for another course failure."); Def. Exh. M (outlining "the review process followed for *all* students [when] they fail a final examination," and stating that plaintiff received the same treatment as the other students who had failed Physiology II) (emphasis in original).

[19] Plaintiff also claims that the Program allowed non-white students to "pass" courses when they actually failed (Pl. Aff. ¶¶ 85-99); however, she has not offered any admissible, non-hearsay evidence of this claim.  In contrast, defendant's evidence shows that non-white students, like plaintiff, also failed courses and were dismissed from the Program.  There is no admissible evidence in the record that shows that non-white students who failed courses were ever falsely "passed" by the Program.

19

discriminatory justification for an adverse action may mask a discriminatory animus.  Funco

Const. Corp. v. Waters, 438 U.S. 567, 578 (1978) (after establishing a prima facie case of race

discrimination, "[t]he plaintiff must be given the opportunity to introduce evidence that

[defendant's] preferred justification is merely a pretext for discrimination").  But there is no

genuine issue of fact as to whether the Program's "official policy" was pretextual because

plaintiff has provided no evidence that the Program has not followed its official policies with

respect to similarly situated, non-white students.[20]  Plaintiff has relied on rumors and speculation

that the Program's official policies were not actually followed, and such reliance is not a

sufficient basis on which to survive summary judgment.  See Schwapp v. Town of Avon, 118

F.3d 106, 110 (2d Cir. 1997) ("[A] plaintiff must provide more than conclusory allegations of

discrimination to defeat a motion for summary judgment.").[21]

        The Court is mindful of the difficulty of proving discriminatory dismissal in an

educational context.  See, e.g., id. ("Because direct evidence [in discrimination cases] will rarely

be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which,

if believed, would show discrimination.").  It can be difficult for a plaintiff to unearth evidence

that she was treated differently from other students who were similarly situated to her "in all

material respects."  Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).  Education is an

---

        [20] See, e.g., Eustaquio Dep. 71 (noting that the letters sent to students informing them of academic the penalties and appeals process employed by the Program are "just reproduc[tions of] the student manual").

        [21] For the same reasons, if plaintiff's evidence is seen as meeting the "minimal" standard for showing a prima facie case, Collins v. N.Y. City Trans. Auth., 305 F.3d 113, 118 (2d Cir. 2002), plaintiff has failed to present admissible evidence raising a question of fact as to whether defendant's justification was pretextual.

individualized experience – like snowflakes, no two students are exactly identical.  Defendant's

own discretionary policies recognize that what works for one student may not work for another

one.[22]  (Wright Dep. 21 (stating that probationary periods vary among students because they are

"individually tailored based upon performance in the past, length of time left in the program, and

what we believe are the circumstances around it.  You cannot set a time frame on a student.").)

But circumstantial evidence of discrimination is not impossible to uncover, and in this case,

plaintiff has failed to unearth any evidence supporting her claim that she has been treated

differently from similarly situated, non-white students.

Because "[p]laintiff's academic record establishes that she did not meet the Program's

academic standards" (Wright Aff. ¶ 31), her dismissal was within the letter, and spirit, of the

Program's policies.  Plaintiff has failed to establish that she was treated differently from

similarly situated, non-white students, all of whom were subject to the same policies.  Therefore,

defendant's motion for summary judgment on plaintiff's claim of discriminatory dismissal is

granted.

> B.    Retaliation

_____

[22] Title VI does not prohibit differential treatment of students.  Title VI prohibits differential treatment *on the basis of race*; even if the reasons for defendant's actions are still unclear when defendant moves for summary judgment, or even if those reasons appear arbitrary or unjustified to the Court, unless a reasonable jury could find that defendant's conduct was motivated by plaintiff's race, summary judgment is appropriate.  See Distasio v. Perkin Elmer Corp. 157 F.3d 55, 61-62 (2d Cir. 1998) ("[Title VII] plaintiffs may not avoid summary judgment by simply declaring that state of mind is at issue . . . and plaintiff must still offer concrete evidence from which a reasonable jury could return a verdict in [her] favor.") (citations and internal quotation marks omitted).  The Court's responsibility is to determine whether defendant engaged in discriminatory conduct, not to second-guess the professional judgment of educators.  See Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment.").

Plaintiff also claims that she was dismissed from the Program in retaliation for engaging in protected activity under Title VI.  Retaliatory dismissal is actionable under Title VI.  See Scelsa v. City Univ. of N.Y., 806 F.Supp. 1126, 1141 (S.D.N.Y. 1992).  To state a prima facie case of retaliation, plaintiff must show: (1) that she engaged in a protected activity; (2) that defendant was aware of that activity; (3) that she suffered an adverse decision in the pursuit of her education; and (4) that there was a causal connection between the protected activity and the adverse decision.  See Davis v. Halpern, 768 F. Supp. 968, 985 (E.D.N.Y. 1991), citing Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1998).  However, plaintiff "need not establish that the conduct [s]he opposed was in fact a violation of Title [VI]" to maintain a retaliation claim.  Manoharan, 842 F.2d at 593 (citation omitted).

Plaintiff may show a causal connection either (1) "*indirectly*," by presenting evidence of temporal proximity between the protected activity and adverse action, or through other evidence such as different treatment of similarly situated students, or (2) "*directly*, through evidence of retaliatory animus directed against . . . plaintiff by the defendant."  Commodari v. Long Island Univ., 89 F. Supp. 2d 353, 376 (E.D.N.Y. 2000) (emphasis in original), citing DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987).  Even if plaintiff satisfies the prima facie test for retaliation, if defendant offers a legitimate, non-retaliatory reason for the adverse action, the presumption of retaliation drops from the case.  See Wang v. State Univ. of N.Y. Health Sciences Ctr. at Stony Brook, No. 02 Civ. 5840, 2006 WL 3939550, at *3 (E.D.N.Y. Feb. 23, 2006).  Plaintiff still may succeed on the retaliation claim, but only if she can show that

defendant's legitimate reason for the adverse action was in fact merely a pretext for retaliation. Id.

Construing the facts in the light most favorable to plaintiff, she has presented sufficient evidence to show a prima facie case of retaliation. On April 18, 2003, plaintiff's counsel sent a letter to Edwin Eustaquio, the Program's Senior Clinical Coordinator, in response to an ongoing investigation into allegations that plaintiff had cheated on an exam. (Pl. Exh. 2.) The letter included a claim that "racial animus may have motivated these students to level such serious charges." (Id.) As discussed infra, such animus may create a hostile educational environment, and maintenance of a hostile educational environment is a violation of Title VI. See Rodriguez v. N.Y. Univ., No. 05 Civ. 7374, 2007 WL 117775, at *6 (S.D.N.Y. Jan. 16, 2007). Thus, by bringing her colleagues' alleged "racial animus" to defendant's attention, plaintiff engaged in an activity protected by Title VI. In addition, it is undisputed that defendant was aware of the protected activity,[23] and that plaintiff suffered an adverse action at the hands of defendant when she was dismissed from the Program.

Defendant argues that plaintiff has not shown a temporal proximity between her protected activity and her dismissal; specifically, defendant argues that the five-month span between her April 18 letter and her September 4 dismissal is too attenuated to establish a causal relationship. However, plaintiff argues, correctly, that there is no bright line in determining sufficient temporal proximity between protected activity and adverse action in a retaliation claim. See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed., 444 F.3d 158, 168 (2d Cir. 2006)

---

[23] Although Dean Llewellyn claims he never received the April 18 letter (Llewellyn Reply Aff. ¶ 3), it is undisputed that Eustaquio did receive and review it. (Eustaquio Dep. 28.)

("No bright line . . . define[s] the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.") (alterations in original) (citation and internal quotation marks omitted).  Comparable, and even longer, time lags between protected activity and adverse action have been held to permit an inference of retaliation.  See Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 555 (2d Cir. 2001) (passage of up to five months short enough for causal connection); Richardson v. N.Y. State Dep't of Correctional Serv., 180 F.3d 426, 446-47 (2d Cir. 1999) (acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier); Bernhardt v. Interbank of N.Y., 18 F. Supp. 2d 218, 226 (E.D.N.Y. 1998) (characterizing the question of whether a causal connection was established by an eleven-month span between protected activity and adverse action as "a question of fact, beyond the authority of the Court to resolve").  Thus, the five-month span between plaintiff's April 18 letter and her September 4 dismissal is not too attenuated to permit a factfinder to infer a causal relationship, and plaintiff has satisfied the prima facie test for retaliation.[24]

However, because defendant offers a legitimate, non-retaliatory reason for plaintiff's dismissal – her failure in Geriatrics while on academic probation – the presumption of retaliation

---

[24] Plaintiff argues that defendant actually retaliated against her on June 12, 2003, when she was inexplicably dropped from the Program's rolls (Pl. Aff. ¶¶ 42–46), instead of September 4, 2003, when she was actually dismissed from the Program, thereby reducing the temporal proximity to two months.  However, the June 12 event did not result in plaintiff's dismissal – plaintiff was allowed to enroll in courses during the Summer 2003 semester.  Plaintiff points to no actual adverse consequences resulting from the June 12 event, which therefore cannot support a retaliation claim.  However, the June 12 event may constitute indirect evidence of defendant's alleged retaliatory animus, as discussed infra.

drops from the case.  The question thus becomes whether plaintiff has presented evidence of retaliation sufficient to raise a genuine question of whether the proferred reason was a pretext for unlawful retaliation.

The Court will not address every specific allegation plaintiff makes to support her retaliatory animus claim; suffice to say, none of her examples are supported by the record.  For example, plaintiff claims that (1) she was given inadequate time during her Physiology II review session (Pl. Dep. 89 ("I was not given the same opportunities like the other students were given.")); (2) the CSC recommended that plaintiff's Physiology II instructor offer her a second Physiology II make-up exam, but she was never given it (Pl. Dep. 90); and (3) the Geriatrics exam, the failure of which led to her dismissal, was "full with errors."  (Pl. Exh. 8, Letter from Plaintiff to Maurice E. Wright, dated Sept. 11, 2003.)  But plaintiff has presented no evidence that defendant's motivation with respect to any of these situations was retaliatory, nor are the alleged facts indicative of pretext.  Plaintiff received the same final exam in Geriatrics as every other student; even if the test was deficient, *every student* was required to take the same exam. (Pl. Dep. 254.)  Moreover, plaintiff received the same amount of time in her Physiology II review as the other students who failed the exam, and more than the amount of time recommended by the CSC.  (Def. Exh. M)  Finally, the Program leaves it to the instructor's discretion whether to administer a second make-up exam, which the Physiology II instructor declined to do because she felt plaintiff "had sufficient opportunity to achieve mastery of the

Physiology II subject matter at the time of the final examination and subsequent make-up examination."[25]  (Garvey Aff. ¶ 14.)

Plaintiff also alleges that retaliatory animus can be inferred from her dismissal because other students who also failed Geriatrics and other courses were mysteriously "passed" by the Program.  (Pl. Aff. ¶¶ 86-87, 89-91, 93-96, 98-99.)  For example, plaintiff claims that one student received a grade lower than she on the Geriatrics exam, but he passed while plaintiff failed.  (Id. ¶ 60.)  However, plaintiff has presented no supporting evidence for her allegation that other students were "passed" by the Program despite failing a course – her allegations are merely unsubstantiated hearsay.[26]

There is only one event in the record for which defendant has not offered a legitimate, substantiated explanation – plaintiff's unexplained involuntary withdrawal from the Program on June 12, 2003.  On that date, the Program "processed" plaintiff as withdrawn and dropped her from the rolls, even though plaintiff claims that she did not withdraw from the Program.  (Pl.

---

[25] Plaintiff also argues that defendant's response to the allegations of cheating made against her during the Spring 2003 semester establishes defendant's retaliatory animus.  (Pl. Aff. ¶¶ 7-26; Rahman Aff. ¶¶ 3-15.)  However, defendant's conduct with respect to the cheating allegations does not demonstrate a retaliatory animus.  First, the initial allegations were made by other students, not by defendant.  (Pl. Aff. ¶¶ 7, 11.)  In addition, plaintiff has presented no evidence that defendant treated plaintiff differently than any other student accused of cheating.  (Llewellyn Aff. ¶ 14; see Llewellyn Dep. 72-86.)  (Compare Llewellyn Dep. 73 (stating that, after Dean Llewellyn met with plaintiff's class to investigate the allegations, "[he] still had to go through the process as outlined in the student manual and refer the allegations to the [CSC] so it [could] be properly documented"), with Def. Exh. F at 38 (requiring allegations of cheating to be referred to the CSC).)  Finally, when the cheating allegations against plaintiff could not be substantiated, the investigation against her was dropped, and she suffered no adverse action as a result of the allegations.  (Pl. Aff. ¶ 19.)

[26] For a more in-depth discussion of plaintiff's reliance on hearsay to support her claims of disparate treatment, see Section IV.A, supra.

Aff. ¶¶ 42-43.)  (See Llewellyn Dep. 93 (claiming "[n]o explanation" for plaintiff's June 12

withdrawal).)  Plaintiff argues that "[t]he conclusion is inescapable that Mr. Llewellyn verbally

directed the office that I be dropped from the Program."  (Pl. Aff. ¶ 46.)  (Compare id., with

Llewellyn Dep. 87-90 (stating that Dean Llewellyn himself investigated plaintiff's withdrawal

but did not discover the reason for it).)  But regardless of defendant's failure to adequately

explain the June 12 event, no retaliatory animus can reasonably be inferred from it.  Plaintiff's

"withdrawal" occurred on paper only – plaintiff was not actually dismissed in June.  Instead,

plaintiff was allowed to enroll in classes during the Summer 2003 semester, and her name

appears on the final grading sheets for that semester.  (Pl. Exh. 5.)  She was not in fact dismissed

from the Program until after she failed another course.

Even assuming arguendo that the June 12 withdrawal could possibly have been motivated

by a retaliatory animus, plaintiff fails to acknowledge two crucial intervening events between

June 12 and her actual dismissal which negate any reasonable inference of retaliatory animus

underlying the June 12 event:  the Program's recommendation that plaintiff receive a second

make-up exam in Physiology II on July 16,[27] and the Program's decision to extend special

treatment to plaintiff to allow her to continue in the Program without being "recycled" on July

30.  There is no reasonable explanation for why defendant would have a retaliatory animus

against plaintiff in June that resulted in a deliberate, "clandestine" dismissal from the Program,

---

[27] Although the Physiology II instructor declined to offer plaintiff a second make-up exam, plaintiff does not dispute that the CSC recommended such a make-up, or that the Program's policy left it to the instructor's discretion as to whether to actually offer the second make-up exam, notwithstanding the CSC's recommendation.

and just one month later, with Dean Llewellyn's explicit approval,[28] extend special treatment to plaintiff that allowed her to progress in the Program.  These intervening events negate any reasonable inference of retaliatory animus created by the June 12 event.

The record thus establishes that defendant had a legitimate, non-retaliatory reason for dismissing plaintiff – her academic performance was deficient.  (See Llewellyn Aff. ¶ 32 ("Plaintiff had failed to demonstrate a satisfactory level of knowledge, skills and competence in two subject areas necessary to practice as a physician assistant.").)  (See also Pl. Dep. 80-81 (discussing plaintiff's poor performance in a third course, Pharmacology).)  Absent any affirmative evidence that plaintiff's dismissal was motivated by a retaliatory animus, plaintiff is left with a weak inference arising from the not particularly close temporal proximity between her

_____

[28] According to plaintiff, Dean Llewellyn had a particularly strong retaliatory animus against her because she "brought the lawyers" into the Program.  (Rahman Aff. ¶ 15.)  Plaintiff attributes this animus to the Dean, to a large extent, as a result of his conduct during his investigation of the cheating allegations made against plaintiff.  As a part of his investigation, Dean Llewellyn addressed plaintiff's class to determine whether the allegations could be substantiated.  (Llewellyn Dep. 73; Pl. Aff. ¶ 14.)  During this address, plaintiff claims that the Dean stated, "if [I do] not like a student [I will] find a way to get rid of them" (Pl. Exh. 8), and that plaintiff "was shocked, and started wondering whether [Dean Llewellyn] was attempting to intimidate [her]."  (Pl. Aff. ¶ 14.)  However, as offensive or threatening as this statement may have been, there is no evidence that the Dean was directing his statement towards plaintiff in particular, or that it was motivated by anything other than a desire to curtail both cheating and false allegations of cheating.  (Llewellyn Aff. ¶ 14.)  Cf. Montanile v. Nat'l Broadcasting Co., 216 F. Supp. 2d 341, 343-44 (S.D.N.Y. 2002) (deeming a "lone statement" that appears to be a "general remark" to be insufficient evidence of retaliatory animus).  Moreover, as discussed supra, plaintiff has presented no evidence that the Dean responded to the cheating allegations made against plaintiff any differently than he would to cheating allegations made against anyone else.  Indeed, it is not even clear whether the Dean actually knew about plaintiff's protected activity at the time he investigated the cheating allegations.  (Llewellyn Reply Aff. ¶ 3 (claiming that the Dean never received plaintiff's April 18 letter).)  Finally, any retaliatory animus attributable to Dean Llewellyn is negated by his approval of the CSC's recommendation that plaintiff not be required to serve a prescriptive year after her Physiology II failure and that plaintiff be offered a second make-up exam.  (See Llewellyn Aff. ¶ 15 (noting that the Dean must approve all academic recommendations of the CSC).)

protest and her dismissal, which is insufficient to raise a jury question of pretext.  See Wang,

2006 WL 3939550, at *6 (granting defendant's motion for summary judgment on plaintiff's

retaliation claim because, "[s]imply put, Plaintiff has not provided any evidence from which a

juror or this Court can infer that Defendants' proffered reasons for [the adverse action] were pre-

textual to Defendants' alleged retaliatory animus").  Therefore, defendant's motion for summary

judgment with respect to plaintiff's retaliation claim is granted.

C.        Hostile Educational Environment

Finally, plaintiff claims that defendant maintained a racially hostile environment in

violation of Title VI.[29]  "[A]n educational institution may be liable for [creating a hostile

environment] if it is deliberately indifferent to racial harassment to such an extent that the

indifference can be seen as racially motivated."  Rodriguez, 2007 WL 117775, at *6 (citations

and internal quotation marks omitted).  Plaintiff does not have to show that defendant actively

"encouraged" or condoned" the harassment, Deleon v. Putnam Valley Bd. of Educ., No. 03 Civ.

---

[29] Defendant argues that plaintiff's hostile environment claim should be dismissed because it was not specifically pled in the original complaint.  However, plaintiff was not required to employ any magic words to pursue a hostile educational environment claim under Title VI.  See Cruz v. Coach Stores, Inc., 202 F.3d 560, 568-69 (2d Cir. 2000).  Plaintiff's complaint included detailed allegations of hostile educational environment such that "the essential elements of the charge do appear in the complaint."  Id. at 569.  Moreover, much of plaintiff's discovery focused on the hostile environment claim.  (Pl. Aff. ¶¶ 72-81.)  See, e.g., Cruz, 202 F.3d at 569 ("[S]everal of the numerous discovery disputes that took place over the course of the litigation concerned [plaintiff's hostile environment claim], thereby foreclosing any argument that the defendants lacked notice of [plaintiff's] claim.").  Thus, defendant was on sufficient notice of plaintiff's hostile environment claim, and, as a result, plaintiff's failure to specifically plead it in her complaint did not prejudice defendant.  Cf. id. (holding that "a party's failure to plead an issue it later presented must have disadvantaged its opponent in presenting its case" for the claim to be dismissed based on the failure to plead), citing N.Y. State Elec. & Gas Corp. v. Sec'y of Labor, 88 F.3d 98, 104 (2d Cir. 1996).

10274, 2006 WL 236744, at *12 (S.D.N.Y. Jan. 26, 2006); instead, "turn[ing] a blind eye" to the harassment is enough to state a prima facie case of hostile educational environment.  Id.[30]

In order to establish deliberate indifference, plaintiff must allege facts demonstrating that defendant: (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive, and objectively offensive that it (4) deprived plaintiff of access to the educational benefits or opportunities provided by the Program.  See Rodriguez, 2007 WL 117775, at *6 (citations omitted).  The third and fourth factors of the test necessarily combine objective and subjective elements.  Compare Folkes v. N.Y. Coll. of Osteopathic Medicine of N.Y. Inst. of Tech., 214 F. Supp. 2d 273, 292 (E.D.N.Y. 2002)  ("[T]he racial harassment [must be] sufficiently severe or pervasive so as to alter the conditions of her education and create an abusive educational environment."), with Schiano v. Quality Payroll Sys., 445 F.3d 597, 600 (2d Cir. 2006) (characterizing the same issue as whether the victim "would find . . . that the harassment so altered working conditions as to make it more difficult to do the job") (citation and internal quotation marks omitted).  In addition, because a defendant need not have taken any

---

[30] Plaintiff's hostile environment claim is entirely distinct from her claims of discriminatory or retaliatory dismissal.  Even if plaintiff ultimately failed to succeed in the Program and was dismissed for legitimate reasons, such failure does not retroactively validate unequal treatment imposed on her while registered.  As the Department of Education has reminded us, "[a]n educational institution has a duty to provide a nondiscriminatory environment that is conducive to learning.  In addition to the curriculum, students learn about many different aspects of human life and interaction from school.  The type of environment that is tolerated or encouraged by or at a school can therefore send a particularly strong signal to, and serve as an influential lesson for, its students."  Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance, 59 Fed. Reg. 11448, 11449 (DOE Notices March 10, 1994).  Thus, whether plaintiff failed one class or ten classes, whether plaintiff was unfit to proceed in her education, and whether plaintiff's repeated personal or academic difficulties posed challenges to administrators are not valid considerations in the hostile environment determination.  An environment that is free from racial hostility must be maintained for all students, regardless of personal characteristics or academic prowess.

30

actual adverse action against plaintiff to create or maintain a hostile educational environment, any deprivation of educational opportunities may be the residue of plaintiff's "subjective[]" perception that the environment was "hostile or abusive," Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir. 2003), as much as the objective result of the hostile environment. See also Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995) (finding that the determination "whether [an environment] should be viewed as hostile or abusive" must be based on "both a reasonable person's standpoint as well as the victim's subjective perception"). This mixed inquiry means that a court must look at the "totality of the circumstances" to determine whether a hostile educational environment actually existed. Hayut, 352 F.3d at 745. See also id. at 746 ("[A hostile environment analysis] is not, and by its nature cannot be, a mathematically precise test.") (citation and internal quotation marks omitted).

Plaintiff has presented sufficient evidence on each of these elements to present an issue of fact for trial. For example, plaintiff has submitted substantial evidence that defendant "had actual knowledge of" the racial hostility towards plaintiff; plaintiff initially brought the hostility to defendant's attention in her April 18 letter, and other meetings between plaintiff and administrators in the Program show that plaintiff repeatedly complained of harassment by her colleagues. (Llewellyn Dep. 127-28 ("[Plaintiff] basically told me that there's a student in the classes harassing her . . . ."); id. 131; Pl. Dep. 118-124.) (Compare Llewellyn Dep. 130 ("[Plaintiff] actually never told me that was discriminated [sic]."), with id.142 ("I believe [plaintiff] did say that there was some racial remarks thrown back and forth.").) The degree to which plaintiff's complaints to the Program included allegations of racial harassment is unclear, and so whether defendant had sufficient knowledge of the alleged hostile educational

31

environment is a question about which reasonable jurors may differ.  See Folkes, 214 F. Supp.

2d at 285 (recognizing that plaintiff's discussions with defendant "focused on her academic

worries" and not on her allegations of hostile environment, but finding that the court must

"giv[e] the plaintiff the deference she is due on this [summary judgment motion]").

Reasonable jurors could also disagree about whether defendant was "deliberately

indifferent" to the alleged hostile educational environment.  Plaintiff and defendant offer

conflicting testimony as to whether defendant ever responded to plaintiff's allegations.

(Compare Llewellyn Dep. 128 (claiming Dean Llewellyn investigated plaintiff's allegations of

an incident of harassment that led to a hospital police complaint against other students), with Pl.

Aff. ¶¶ 75, 79 (claiming Philip Ashley, a Program faculty member, witnessed an instance of

harassment but did not respond to it and asked plaintiff not to involve him in her "politics"), and

Wright Dep. 109-10 (acknowledging the CSC's decision at the July 16 meeting not to discuss

plaintiff's harassment allegations).)  Moreover, there is no evidence in the record that

administrators took any concrete steps to defuse any racial hostility that may have existed.  The

conflicting evidence thus raises a triable issue of fact as to whether defendant took "remedial

measures to address" plaintiff's allegations of harassment.  Gonzalez v. Esparza, No. 02 Civ.

4175, 2003 WL 21834970, at *3 (S.D.N.Y. Aug. 6, 2003), citing Folkes, 214 F. Supp. 2d at 283.

Finally, reasonable jurors could also disagree about whether the harassment was severe

or pervasive enough to create a hostile educational environment.  Plaintiff cites numerous

examples of both physical and verbal harassment (Pl. Aff. ¶¶ 72-84), and one such incident

resulted in plaintiff's filing a report with the hospital police.  (Pl. Aff. ¶ 77; Llewellyn Dep. 127.)

Many of those incidents do not involve overt racial elements.  However, plaintiff cites a number

of occasions on which she was subjected to explicitly racial hostility.  (See, e.g., Pl. Aff. ¶ 75

(claiming another student called plaintiff a "white bitch" and told her to "go home and die"); id.

¶ 102 ("I heard students repeatedly talk about my being in a 'black school.'  Indeed, on one

occasion, . . . a [nonwhite student] advised me that I should not show the other, i.e., nonwhite,

students that I was 'better.'").)  Few would be so naive as to believe that racists subjecting a

member of a disfavored group to abuse or harassment would preface every rude action with a

racial epithet; given some evidence of clearly racial hostility, a reasonable fact finder could

conclude that other obnoxious behavior, which in another context could be ascribed simply to

interpersonal friction, was similarly racially motivated.

　　　　In any event, even one incident of racial harassment, if sufficiently severe, can create a

hostile educational environment.  See Richardson, 180 F.3d at 437 ("[E]ven a single episode of

harassment, if severe enough, can establish a hostile . . . environment.") (citation and internal

quotation marks omitted).  Of course, a reasonable jury could find that plaintiff has not provided

sufficient evidence of "repeated and continuous" harassment to constitute a hostile environment,

Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992); however,

though "[r]easonable jurors may well disagree about whether these incidents" negatively altered

plaintiff's educational environment, "the potential for such disagreement renders summary

judgment inappropriate."  Richardson, 180 F.3d at 439.  See also Schiano, 445 F.3d at 605

(noting that hostile environment claims "present mixed question[s] of law and fact that are

especially well-suited for jury determination") (alterations in original) (citation and internal

quotation marks omitted); Hayut, 352 F.3d at 745 ("Generally speaking, [the hostile

environment] analysis is fact-specific and . . . is best left for trial.").

Therefore, defendant's motion for summary judgment on plaintiff's hostile educational environment claim is denied.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted as to plaintiff's claims of discriminatory and retaliatory dismissal, and denied as to her claim of hostile environment discrimination.  Plaintiff's cross-motion for partial summary judgment is denied.

SO ORDERED.

Dated: New York, New York
       March 15, 2007

GERARD E. LYNCH
United States District Judge

34